IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARNDELL BRYANT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-427 |
| | § | |
| JO ANNE B. BARNHART, Commissioner, | § | |
| Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT

On August 14, 2006, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c).  The case was then transferred to this court.  Cross-motions for summary judgment have been filed by Plaintiff Larndell Bryant ("Plaintiff," "Bryant") and Jo Anne B. Barnhart ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry # 8; Commissioner's Motion and Memorandum for Summary Judgment ["Defendant's Motion"], Docket Entries # 6, 7).  Each party has responded to those cross-motions.  After considering the pleadings, the evidence submitted, and the applicable law, it is ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED IN PART, and DENIED IN PART, and that Defendant's Motion for Summary Judgment is likewise GRANTED IN PART, and DENIED IN PART.  It is further ORDERED that Plaintiff's claim for Supplemental Security Income benefits is REMANDED, so that the record can be developed further on the severity of Plaintiff's mental impairments.

## Background

On October 26, 2000, Plaintiff Larndell Bryant filed applications for both Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for Supplemental Security Insurance ("SSI") benefits, under Title XVI of the Act.[1]  (Transcript ["Tr."] at 54-56).  He claimed that he had been unable to work since April 15, 1994,[2] as a result of "major depression [with psychotic] features," diabetes, and a pinched nerve in his lower spine.  (Tr. at 54, 65).  The SSA denied his application on March 26, 2001, after deciding that he is not disabled under the Act.  (Tr. at 29, 31-35).  Plaintiff petitioned, unsuccessfully, for a reconsideration of that decision.  (Tr. at 30, 36).

Bryant then requested a hearing before an administrative law judge ("ALJ").  (Tr. at 42).  That hearing took place on July 16, 2002, before ALJ Clifford Leinberger.  (Tr. at 464).  Plaintiff appeared and testified at the hearing, and he was accompanied by his attorney, Michael Hengst.  (*Id.*).  The ALJ also heard testimony from Diann Fisher ("Ms. Fisher"), Bryant's neighbor; Dr. Lloyd Jones ("Dr. Jones"), an internist; Dr. Ashok Khushalani ("Dr. Khushalani"), a psychiatrist; and Herman Litt ("Mr. Litt"), a vocational expert witness.  (*Id.*).

On July 25, 2002, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

---

[1] Bryant's application for SSI benefits is not included in the record.  However, the parties and the ALJ all note that he applied for both benefits on October 26, 2000.  (*See* Plaintiff's Motion at 1; Defendant's Motion at 2; Tr. at 18).  While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that he is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[2] There is no dispute that Bryant was insured for purposes of DIB through December 31, 1996, and would have been otherwise eligible for SSI benefits from the date of his application.  (20 C.F.R. § 416.335; Tr. at 18; Defendant's Motion at 2).

1.   An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.   If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Bryant has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d

340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has "hypertension, diabetes mellitus, degenerative dis[k] disease, and a depressive disorder."  (Tr. at 27).  Although he determined that these impairments, alone or in combination, are severe, he concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.  (Tr. at 19, 27).  He also found that Bryant is unable to return to any of his previous work as a forklift operator, landscaping laborer, or day laborer.  (Tr. at 26, 27).  At step five of his analysis, however, he found that Bryant has the residual functional capacity to perform other work that is available in the national economy.  (Tr. at 27-28).  He determined that Bryant is capable of work that requires

4

only a light level of physical exertion, specifically referencing employment as a "laundry bagger," an "office cleaner," a "garment sorter," or a "packer." (Tr. at 26, 28). He also found that a significant number of such jobs are available in the national economy. (Tr. at 28). For these reasons, the ALJ concluded that Bryant is "not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision," and he denied his applications for benefits. (*Id.*).

On August 1, 2002, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 13). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On December 9, 2004, the Appeals Council denied Plaintiff's request, concluding that no reason for review existed under the regulations. (Tr. at 4). With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On February 9, 2005, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Original Complaint ["Complaint"], Docket Entry # 1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, the court concludes that both motions should be granted in part, and denied in part, and that Plaintiff's claim for SSI benefits should be remanded so that the record can be developed further on the severity of his mental condition.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

In his motion, Plaintiff claims that he became disabled on April 15, 1994, because of "major depression, diabetes, hypertension and degenerative dis[k] disease."  (Plaintiff's Motion at 1).  He asks this court to reverse the Commissioner's decision to deny him disability benefits, and to render a judgment in his favor, for three reasons.  First, Bryant claims that the ALJ erred because he "failed to consider the combined effect of [his] impairments" in determining that none of them met or equaled the requirements of any medical "listings" ("Listings") set out in the Social Security regulations.  (*Id.* at 4).  Next, he complains that the ALJ erred because he did not complete a

6

psychiatric review technique form before rendering his decision.  (*Id.* at 6).  Finally, he argues that the ALJ erred because he did not find that his mental condition meets, or equals in severity, the requirements of Listing 12.04, which speaks to affective disorders.  (*Id.* at 5)  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"] at 1-5).

### Medical Facts, Opinions, and Diagnoses

The earliest available evidence shows that, on January 23, 1995, Bryant went to an emergency room within the Harris County Hospital District ("HCHD"), complaining of lower back pain.  (Tr. at 110).  He was diagnosed as suffering from musculo-skeletal pain, for which he was prescribed pain medication, ordered to be on "bed rest" for one week, and told to use a heating pad as necessary.  (Tr. at 111).  The hospital record notes that Bryant was in the custody of the Harris County Sheriff's Office at the time.  (Tr. at 110).  On November 6, 1996, Bryant again went to an HCHD emergency room, this time complaining of abdominal pain and nausea.  (Tr. at 123).  He was diagnosed with appendicitis, a small bowel obstruction, and an infection.  (Tr. at 112, 119).  He was admitted to the hospital, and underwent an appendectomy, an abdominal drainage, and  given antibiotic injections.  (*Id.*).

In 1998, Bryant was convicted of delivery of a controlled substance, and was sentenced to the Texas Department of Criminal Justice ("TDCJ").  (Tr. at 480).  TDCJ medical records, dated September 9, 1999, through September 14, 2000, show that Bryant had a variety of tests, consultations, immunizations, and medications to address his complaints of back pain, diabetes, hypertension, insomnia, and depression, among other ailments.  (*See* Tr. at 135-211).

7

On September 14, 2000, Bryant was released from TDCJ to the New Directions Club, Inc.'s ("New Directions") residential program for substance abuse treatment. (Tr. at 136, 232). On September 18, 2000, the New Directions staff administered a "Biopsychosocial Assessment," which included information on Bryant's education, employment, family, and medical background, along with his history of drug use. (Tr. at 270-79). Following the assessment, the counselor reported that, "Client has not been able to sustain any permanent long term relationship due to drug use and criminal lifestyle." (Tr. at 273). At the time of the assessment, Bryant reported that he had stopped taking non prescription drugs in February 1993. (Tr. at 276).

While at New Directions, Bryant was referred to Harris County's Mental Health and Mental Retardation Authority ("MHMRA") NeuroPsychiatric Center for a mental health assessment. (Tr. at 213). On October 5, 2000, Dr. Terry Rustin ("Dr. Rustin") found that Bryant was depressed, although, on that day, he denied any suicidal thoughts. (Tr. at 214). Dr. Rustin noted Bryant's report that he felt tired, hopeless, worthless, and lonely, that he suffered crying spells, and that he often heard his deceased grandfather speaking to him. (Tr. at 216). Dr. Rustin also made note of Bryant's extensive history of substance abuse. (Id.). Following his examination, Dr. Rustin found Bryant to have a good appearance, "decreased psychomotor activity," clear speech, a reported depressed mood, and a "goal-oriented, logical" thought process, with "no evidence of delusions." (Tr. at 217). On that day, he diagnosed Bryant as suffering from a "major depressive disorder with psychotic features," as well as alcohol dependence. (Tr. at 218). He found, however, that the alcohol dependence was in remission and he rated Bryant's prognosis for recovery as "guarded."

8

(*Id.*).  Following his exam, Dr. Rustin gave Bryant a score of 40 on the Global Assessment of Functioning ("GAF") scale.[3]  (*Id.*).

On October 9, 2000, Bryant had a physical examination at New Directions.  (Tr. at 280). Following that examination, the staff doctor concluded that Bryant suffered from diabetes, hypertension, a pinched nerve in his back, and a depressive disorder.  (*Id.*).  While a resident of the treatment center, Bryant continued to take pain medication and anti-depressants "for depressed mood."  (*See*, *e.g.*, Tr. at 239, 254-55).  On December 11, 2000, Bryant was released from the treatment center, and placed in New Direction's aftercare program, based on the assessment that his "prognosis for a successful community adjustment for an extended period of time is . . . Good." (Tr. at 231).

On February 6, 2001, Bryant was being treated by Dr. Katherine McQueen ("Dr. McQueen"), at HCHD, for diabetes, hypertension, and lower back pain.  (Tr. at 333).  On that day, she gave Bryant a "medical clearance to return to work," with the restriction that he not lift any heavy objects.  (*Id.*).

Ten days later, Dr. Mehboob Nazarani ("Dr. Nazarani"), a psychiatrist, conducted a mental examination at the request of the state.  (Tr. at 287).  Dr. Nazarani noted that Bryant "wrecked his brother's car" while driving to the appointment, and appeared to be stiff and uncomfortable during the exam.  (*Id.*).  Dr. Nazarani found Bryant to be well-groomed, "coherent, relevant, and logical."

---

[3] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication . . . [or] major impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*

(Tr. at 289). He also described him as cooperative, normal in speech, and oriented. (*Id.*). Further, he found that his recent and long-term memory was intact, and he rated his judgment as "fair." (*Id.*). Finally, he reported that he could do "simple arithmetic without any problems," and could recognize similarities and differences. (*Id.*). He observed, however, that Bryant appeared to suffer from back pain, and that, by his own report, he was depressed, paranoid, and hearing voices. (*Id.*). In his testing, Dr. Nazarani discovered that Plaintiff had difficulty counting in threes, and did not understand proverbs. (*Id.*). Dr. Nazarani noted that Bryant lived with his brother at the time, but needed no assistance with grooming or hygiene, that he did limited household chores, that he was able to use a car, as well as public transportation, and that he went to church twice a month. (Tr. at 289-90). Dr. Nazarani also found that Bryant "did fairly well" in the areas of concentration, persistence, and pace, but noted "a significant history of psychosocial deterioration." (Tr. at 290). Dr. Nazarani diagnosed Bryant as suffering from a depressive disorder, not otherwise specified, and psychosis, not otherwise specified, and remarked on his history of substance abuse. (*Id.*). In that regard, Dr. Nazarani commented that Bryant's depression and reported psychotic symptoms could be "secondary to his substance abuse." (*Id.*). Dr. Nazarani assigned Bryant a GAF score of 40, and determined that his prognosis for recovery was "extremely guarded." (Tr. at 291). In concluding his report, Dr. Nazarani observed that Bryant's success was dependent on his compliance with prescribed treatment, including total abstention from drugs and alcohol. (*Id.*).

On February 23, 2001, Dr. Richard Johnson ("Dr. Johnson"), an internist, examined Bryant, on behalf of the state, as well. (Tr. at 293). Dr. Johnson observed that Bryant used a cane, and had an unsteady, abnormal gait. (Tr. at 294). The doctor reported that, "This man does appear to be in significant pain and to be completely disabled from back pain radiating down both legs which prohibit him from standing [or walking] except with assistance." (Tr. at 295). However, he also

10

observed that, while Bryant was "listed as having depression, [he] did not appear to be depressed, nor to have psychotic features to me in my interview." (*Id.*).

On March 5, 2001, Dr. M. Washington ("Dr. Washington"), a chiropractor, diagnosed Bryant as suffering from cervical, thoracic, and lumbar inflammation, as well as from shoulder pain. (Tr. at 330). He allowed Bryant to return to work, but imposed the following restrictions:

> standing and walking no more than 1-2 hours in a work day; sitting no more than 3-4 hours in a work day; driving no more than 3-4 hours in a work day; and avoiding repetitive motions such as pushing, pulling, hand rotation, bending, squatting, climbing, overhead reaching, twisting, carrying, stooping, and kneeling.

(*Id.*). He also recommended that, while at work, Bryant should take frequent breaks. (*Id.*).

On March 21, 2001, Jim Cox, Ph.D. ("Dr. Cox"), a psychologist, completed a mental residual functional capacity ("RFC") assessment on behalf of the state. (Tr. at 297). Dr. Cox found that Bryant's abilities in "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation" were "not significantly limited," or only "moderately limited." (Tr. at 297-98). Dr. Cox found that Bryant did exhibit symptoms of depression, and that he met some of the criteria applicable to Listing 12.04, the Listing for Affective Disorders. In fact, Dr. Cox noted that Bryant had a mood disturbance that was accompanied by manic or depressive symptoms, evidenced by an "[a]ppetite disturbance with change in weight," a sleep disturbance, "[p]sychomotor agitation or retardation," a decrease in energy, suicidal thoughts, and "[h]allucinations, delusions or paranoid thinking." (Tr. at 304). Nevertheless, he found that Bryant did not meet the level of functional limitation required by the Listing, as a whole. (Tr. at 311). In particular, Dr. Cox found that Bryant was only mildly restricted in his activities of daily living, and in his abilities to concentrate, persist in tasks, and keep an appropriate pace. Dr. Cox found that Bryant had only moderate difficulty in social functioning, and that he had no reported episodes of extended decompensation. (*Id.*).

11

On March 26, 2001, Jimmy L. Breazeale, M.D. ("Dr. Breazeale") was asked to assess Plaintiff's physical residual functional capacity. (Tr. at 315). After his exam, Dr. Breazeale diagnosed Bryant as suffering from degenerative disk disease and hypertension. (*Id.*). However, Dr. Breazeale found that Bryant was still able to do the following:

> occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for at least 2 hours in an 8-hour work day; sit for about 6 hours in a work day; and climb ramps, stairs, or ladders occasionally, but never climb a rope or scaffolding.

(Tr. at 316-17). Dr. Breazeale reported that Plaintiff had no manipulative, visual, or communication limitations, but that he should avoid fumes, gases, odors, dust, and poorly ventilated spaces. (Tr. at 318-19). In sum, Dr. Breazeale concluded that "the alleged limitations caused by [Bryant's] symptoms are not significantly supported by the medical and other evidence." (Tr. at 320).

On May 3, 2001, Merrill Anderson, Ph.D. ("Dr. Anderson"), a psychologist, performed another psychological evaluation on behalf of the state. (Tr. at 323). Bryant had been referred to Dr. Anderson for an intellectual and psychological evaluation "to be used in conjunction with vocational planning and counseling." (*Id.*). Dr. Anderson noted that Bryant was seeking vocational training, "perhaps [in] an electronics-related field." (*Id.*). In his report, Dr. Anderson remarked that, at the time of his interview, Bryant was living alone, in MHMRA-sponsored housing, and that he was responsible for some household chores, as well as for his own grooming. (Tr. at 323-24). Dr. Anderson then detailed Bryant's reported daily activities as praying, writing poetry, and watching TV. (*Id.*). In addition, he noted that Bryant drives a car, makes regular medical appointments, and attends church weekly. (Tr. at 324). Dr. Anderson found, during the interview, that Bryant's general appearance, attitude, and behavior were good. (*Id.*). He also noted, however, that Bryant characterized himself as "somewhat" depressed due to financial and social stressors. (*Id.*). In addition, Dr. Anderson documented Bryant's reports of periodic suicidal thoughts, auditory

hallucinations, and belief that people were "plotting" against him. (*Id.*). Barring those symptoms, Dr. Anderson found Bryant's mental activity, orientation, memory, concentration, abstraction, and insight/judgment to be "fair" to "excellent." Dr. Anderson commented that Plaintiff had average intelligence and academic skills. (Tr. at 324-25). Ultimately, he diagnosed Bryant as suffering from depression, with self-reported psychotic features, and assigned him a GAF score of 50.[4] (Tr. at 325-26). (*Id.*). However, Dr. Anderson then undermined that score by expressing doubt about the extent of Bryant's claimed mental limitations, characterizing his reported symptoms as "exaggerated," and suspect "in light of ongoing SSI appeal." (Tr. at 324-26).

On June 13, 2001, Henry Hanna, Ph.D. ("Dr. Hanna"), a psychologist, performed another mental RFC examination on behalf of the state. (Tr. at 349). Like Dr. Cox, Dr. Hanna found that Bryant's "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation" were either "not significantly limited" or only "moderately limited." (Tr. at 349-50). He found Bryant "able to understand, remember, [and] carry out simple instructions, minimally interact with others, and respond appropriately to change in work place." (Tr. at 351). On the same date, Dr. Hanna completed a Psychiatric Review Technique Form ("PRTF"). (Tr. at 353). On that form, Dr. Hanna found that Bryant's "allegations of pronounced depression with psychotic features was not fully supported by the available evidence." (Tr. at 366). He found further that Bryant was not restricted in his activities of daily living, even though he had moderate difficulty in maintaining social functioning, and mild difficulty in concentration, persistence, and pace. (*Id.*). Dr. Hanna noted that, by history, Bryant had experienced just one or two episodes of decompensation which were of an extended duration. (*Id.*). On these findings, Dr. Hanna

---

[4] A GAF of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.*

determined that Bryant did not meet the requirements of any SSA Listing.  (Tr. at 363).  He concluded that, "[Bryant] appears to have <u>some</u> limitations but none which wholly compromise work abilities."  (*Id.* (emphasis in original)).

The following week, on June 20, 2001, Dr. Randall Rosenberger ("Dr. Rosenberger") again assessed Plaintiff's physical RFC.  (Tr. at 367).  Dr. Rosenberger found that Bryant did not have any exertional, postural, manipulative, visual, communicative, or environmental limitations, explaining that his "alleged limitations caused by the complained of symptoms [are] not supported by the medically subjective evidence."  (Tr. at 368-72).  Finally, Dr. Rosenberger remarked that Bryant's treating physicians at HCHD had reached similar conclusions, as they found that, except for heavy lifting, Bryant was "medically cleared for employment."  (Tr. at 373).

The most recent medical record available includes another letter from Dr. McQueen, dated July 9, 2002.  (Tr. at 462).  That letter released Bryant to return to work, as of that date.  (*Id.*).  Apparently, Bryant had earlier undergone abdominal surgery at an HCHD hospital, and Dr. McQueen's letter gave him clearance to return to work, but with "no heavy lifting or continuous manual labor."  (Tr. at 377, 462).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Bryant was 50 years of age.  (Tr. at 469).  He had completed high school, and had taken some college courses.  (Tr. 470).  Bryant testified that he had previously worked as a quality assurance worker, a forklift operator, a landscaping laborer, and a general day laborer.  (Tr. at 471-72).  He testified that he stopped working, in April 1994, because of severe back pain and depression.  (Tr. at 474-79).

***Subjective Complaints***

In his application for benefits, Plaintiff claimed that he is unable to work because of "major depression w/ psychiatric [sic] features," as well as diabetes, and a pinched nerve in his lower spine. (Tr. at 65).  He reported suffering from lower back pain, which he described as "continuously" "aching" and "throbbing" pain, which increases with standing, walking, lifting, or exercising.  (Tr. at 79).  He added that the pain medication he uses is of "very little" help.  (*Id.*).  Bryant also testified that he suffers from continuous "head pain and pressure," which makes it difficult for him to focus on tasks, and aggravates his depression.  (Tr. at 81).  Bryant reported pain "all over [his] body," as well as weakness in his back, arms, and legs.  (Tr. at 83).  Plaintiff stated that this pain is exacerbated by his diabetes and hypertension.  (*Id.*).  Finally, he complained that people talk "about [him] behind [his] back," and so he "prefers to be alone," which prevents him from working.  (Tr. at 81, 99).

At the hearing, Plaintiff testified that his back problems began in 1992, when he was injured in a car accident.  (Tr. at 474).  He stated that his back pain has never resolved, although he takes "lots of pain medication."  (*Id.*).  He described this pain as a "sharp" one that:

> Runs up and down my back, mostly in my lower spine and sometimes excruciating, sometime[s] it lasts for hours, sometimes I can't walk, I have muscle spasms and it runs down my legs and arms.

(Tr. at 475).  He testified that the pain is frequently so severe that he has to take medication and then lie down.  (Tr. at 475-76).  Bryant also told the ALJ that some of his pain may be the result of complications from his November 1996 appendectomy.  He claims that following the appendectomy he had to undergo two subsequent surgeries to remove scar tissue.  (Tr. at 475).  He explained that his surgeon told him that his current pain may be caused by recent scar tissue, and another surgical

15

procedure might give him some relief.  (*Id.*).  Bryant testified, however, that he does not want to have another operation.  (*Id.*).

Bryant testified that he was first diagnosed with depression in 1995 or 1996.  (Tr. at 476). He claimed to have suicidal thoughts, sometimes two or three times a day, and has had these since 1992 or 1993.  (*Id.*).  He further testified that, since 1992, he sometimes "hears voices."  (*Id.*).  In addition, he told the ALJ that he has difficulty sleeping, due, in part, to his pain, but primarily due to thoughts that "somebody's coming to get [him]."  (Tr. at 476-78).  He testified that he has been treated for these symptoms with both anti-depressants and insomnia medication.  (*Id.*).

In regard to his daily activity, Bryant testified that he spends most of his time drawing pictures and watching TV.  (Tr. at 478).  He testified that his adult daughter and his neighbor, Diann Fisher, cook, clean, and do laundry for him.  (*Id.*).  Bryant claimed that standing, sitting, and walking cause him pain and stiffness.  (Tr. at 479).  He acknowledged that he goes grocery shopping, but he is usually accompanied by a family member or friend when he does so.  (*Id.*).  He testified that he often walks with a cane, because his leg sometimes "gives out," and that he has smoked cigarettes "all [his] life," as much as one pack a day, which he said "calms his nerves."  (*Id.*).  Finally, Bryant testified that, until 1993, he used illicit drugs, and that, until 1998, he abused alcohol.[5]  (Tr. at 480).

***Witness Testimony***

At the hearing, the ALJ also heard testimony from Diann Fisher, who lives in the apartment below Bryant's.  (Tr. at 482).  Ms. Fisher testified that she has known Bryant for almost one year, and that Plaintiff's brother pays her to clean, cook, pick out clothes, and otherwise assist him three days a week.  (Tr. at 483-85).  Ms. Fisher told the ALJ that Bryant "really needs someone to help

---

[5] Bryant acknowledged that, in 1998, he was arrested for delivery of controlled substances, but claims that this conduct was merely an attempt to make money for food, and that he was not using drugs at the time.  (Tr. at 480).

him, like some kind of assistant help," and that she does not believe that he is capable of taking care of himself.  (*Id.*).  She also testified that she has seen Bryant talking to himself, and has seen him outside dressed only in his underwear.  (Tr. at 483).

The ALJ next heard testimony from Dr. Lloyd Jones, an internist, and medical expert witness.  (Tr. at 485).  Dr. Jones's testimony was based entirely on his review of the available medical records.  (Tr. at 486).  Dr. Jones testified that Bryant has three physical impairments which are supported by the evidence, and which are severe under the Act.  He summarized these as non-insulin dependent diabetes mellitus; hypertension; and chronic back pain, which is secondary to degenerative disk disease.  (Tr. at 486-87).  He stated, however, that none of these impairments met, or equaled, either individually or in combination, any relevant SSA Listing.  (Tr. at 487).  Dr. Jones testified further that Bryant is capable of performing only a light level of work, with the following additional restrictions:

> He shouldn't be asked to crawl in his working day.  He shouldn't be asked to climb more than two steps on a vertical ladder.  He shouldn't be asked to work at exposed heights such as scaffolding and the bending and stooping should be limited to an occasional basis and by that, I mean, 1/3 of the working day.

(*Id.*).

The ALJ also heard testimony from Dr. Ashok Khushalani, a psychiatrist.  (Tr. at 488).  Dr. Khushalani based his testimony solely on his review of the medical records, supplemented by Bryant's hearing testimony.  (Tr. at 488, 497).  As a preliminary matter, Dr. Khushalani testified that there is "very sparse information in the medical record" regarding Bryant's mental condition.  (Tr. at 489).  He explained that most of the records were from "independent medical exams," performed by doctors who saw Plaintiff on only one occasion, with "no follow up or substantiation."  (*Id.*).  He then stated that diagnoses made from such independent examinations are typically based on the

17

patient's own report of his symptoms, because the examining physician has had no opportunity to observe him over time.  (*Id.*).  He added that, as a result, patients with a history of substance abuse often exhibit symptoms similar to those associated with major depression and psychosis, and they may be misdiagnosed for that reason.  (*Id.*).

In all, however, Dr. Khushalani testified that Bryant did have a documented history of treatment for a depressive disorder, but he found no evidence that he had ever been treated for psychosis.  (Tr. at 489-90).  On that point, he testified that none of the medications noted in the record are used to treat psychotic symptoms, even though Bryant apparently believed that Librium was prescribed because he was "hearing voices."  (Tr. at 490, 497).  Dr. Khushalani testified that no medical records substantiate Bryant's statement, and he pointed out that "Librium is usually not an anti-psychotic medication," and "is traditionally not a medicine for voices."  (*Id.*).  Dr. Khushalani also testified that, in his opinion, Bryant may have been prescribed Elavil for insomnia, and not depression, as the  record was unclear on which condition it was intended to treat.  (Tr. at 496).  He explained, however, that the amount of Elavil prescribed for Bryant was "not a dosage that one uses for depression.  That dosage is usually given for helping people sleep."  (*Id.*).

At the hearing, Dr. Khushalani was asked by the ALJ to assess whether Bryant's condition met or equaled the requirements of Listing 12.04, the one relevant to affective disorders.  (*Id.*).  That Listing outlines two sets of symptoms, and a claimant is presumed disabled if he meets the criteria detailed in both "A" and "B," or if he meets the criteria in section "C," alone.[6]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04; *Boyd v. Apfel*, 239 F.3d 698, 704 n.8 (5th Cir. 2001).  Dr. Khushalani testified that Bryant's symptoms, if credibly reported, would satisfy section "A" of the Listing,

---

[6] See Appendix A, in which Listing 12.04 is set out in its entirety.

which requires evidence of mood and sleep disturbance, anhedonia,[7] psychomotor retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, suicidal thoughts, and hallucinations. (Tr. at 496). However, he testified that Bryant's condition did not meet or equal the section "B" criteria, because there is no evidence that Plaintiff's symptoms severely restrict his daily activities, social functioning, or ability to maintain concentration, persistence, and pace. (Tr. at 490-91). He testified further that Bryant apparently had no repeated episodes of extended decompensation. (Tr. at 491). In addition, Dr. Khushalani testified that, from his review of the available records, there was no evidence that Bryant's condition met or equaled the criteria in section "C" of the Listing, and so he would not be presumed disabled on that basis. (*Id.*).

Following his direct testimony, Plaintiff's attorney asked Dr. Khushalani to address the GAF score of 40 that had been assigned to Bryant by two different doctors, Dr. Rustin and Dr. Nazarani. (Tr. at 218, 291, 494). Dr. Khushalani acknowledged that a person with a GAF of 40 has a "[s]eriously compromised" ability to function, in terms of self-care, employment, and interpersonal relations. (Tr. at 494-95). He testified, as well, that a person with that score might experience hallucinations. (*Id.*). However, he stated that, in his opinion, the GAF scores of 40, and even the score of 50, given by Dr. Anderson, were not credible. (*Id.*). Dr. Khushalani expressed his opinion that the medical record did not substantiate such low scores. (*Id.*). And, although he testified to his belief that Bryant does suffer back pain, that he exhibits some symptoms of depression, and that he may have experienced hallucinations in the past, Dr. Kushalani was not convinced that the hallucinations resulted from psychosis, rather than substance abuse. (*Id.*). While repeating that

---

[7] "Anhedonia" refers to "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 93 (5th ed. 1998).

treatment records for Bryant are scarce, Dr. Khushalani then questioned Plaintiff's credibility in the following testimony:

> his presentation in the room and his ability to answer the questions and he didn't show any signs of stress and he was able to follow directions, most of his answers were to the point and appropriate so I didn't see any stress evident just being in this room.

(Tr. at 500-01).  He testified that, in his opinion, a person as ill as Bryant is said to be would experience stress during the proceeding.  (*Id.*).  Dr. Khushalani testified, however, that he based his opinions on the record, as a whole, not on his personal assessment of Bryant's credibility.  (*Id.*).

Finally, the ALJ heard testimony from Herman Litt, a vocational expert witness.  (Tr. at 501).  From his review of the record, Mr. Litt described Bryant's prior work, as a forklift operator, as "semi-skilled" labor, and his previous work, as a landscaping and day laborer, as "unskilled" work, all of which require a medium level of physical exertion.  (Tr. at 502).  The ALJ then asked Mr. Litt the following hypothetical question:

> Q        . . . Now, assume and [sic] individual of the age of 42 to 51 years, who has a high school education and at least a basic ability to read, write and use numbers and who has experience as a day laborer and as a landscaping laborer and I think we're going to drop the forklift operator. . . .
>
> *              *              *
>
>         . . . And assume further that the individual has the residual functional capacity to perform work at the light level of exertion, that is to lift 10 pounds frequently and 20 pounds occasionally with mild to moderate pain and discomfort and, while performing at that level of exertion, would be precluded from crawling and climbing more than two steps on a vertical ladder or working at exposed heights such as scaffolding.  In addition, the individual could only bend or stoop occasionally and, by occasional, I mean 1/3 or less of an eight-hour working day.  In addition thereto, the individual -- excuse me -- is affected by some mild to moderate emotional disorder which is manifested in the following manner:  The ability to follow work rules, to relate to coworkers and to interact with supervisors are all categorized as no limitation.  The ability to deal with the public and to use judgment and to function independently are categorized as mild and mild is defined as slightly limited ability.  The ability to maintain attention and concentration, to deal with work stresses and to demonstrate reliability, all categorized as moderate, moderate being defined as less than marked and more than mild.  The ability to

20

understand, remember, carry our complex job instructions is moderate.  The ability to understand, remember, carry out detailed but not complex job instructions is mild and the ability to understand, remember, carry out simple job instructions is not limited.

                                        *    *    *

Q        Given that total hypothetical, could the individual perform past relevant work?

A        No, sir, he could not.

(Tr. at 503-05).  However, Mr. Litt testified further that there are other jobs that such an individual could perform.  (Tr. at 504).  He identified some of these other jobs as laundry baggers, office cleaners, garment sorters, or packers.  (Tr. at 504-05).  He described each of these jobs as light, unskilled labor.  (*Id.*).  In addition, Mr. Litt told the ALJ that approximately 35,000 to 40,000 of these jobs are available in the local economy, and that millions of them are available in the national economy.  (Tr. at 505).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Bryant suffered from "hypertension, diabetes mellitus, degenerative dis[k] disease, and a depressive disorder," and he found that these conditions were "severe."  (Tr. at 19, 27).  He also found, however, that even though he cannot return to his former employment, none of Bryant's impairments met, or equaled in severity, the medical criteria for any applicable Listing.  (*Id.*).  Ultimately, he concluded that Bryant can perform some light level jobs which exist, in significant numbers, in the local, regional, and national economy, and so he is "not disabled" under the Act.  (Tr. at 27-28).  With that conclusion, he denied Bryant's applications for both DIB and SSI benefits.  (Tr. at 28).  That denial prompted Bryant's request for judicial review.

Bryant claims that the ALJ erred because he did not consider the combined effect of his impairments in determining whether they met or equaled any Listing.  (Plaintiff's Motion at 4).  He

challenges, specifically, the finding that his impairments do not meet, or equal, Listing 12.04.  (*Id.* at 5).  He also argues that  the ALJ erred because he did not prepare a "psychiatric review technique form" before making his decision.  (*Id.* at 6).  It is well settled that judicial review of an ALJ's decision is limited to a determination of whether it is supported by substantial evidence, and whether the proper legal standards were applied.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

Bryant argues that, while the ALJ wrote that, "The claimant does not have an impairment *or combination of impairments* that meets or equals in severity the requirements of [each listing addressed]," the record is silent on any actual consideration he gave to those combined effects.  (*Id.* at 5).  Bryant contends that his "case should be remanded so that proper consideration can be give[n] to the combined effect" of his impairments to redress that omission.  (*Id.*).  On review, however, this contention is without merit.

It is well-settled "that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'"  *Fraga*, 810 F.2d at 1305 (quoting *Dellolio v. Heckler*, 705 F.2d 123, 128 (5th Cir.1983)).  Further, there is no dispute that, in considering whether a claimant's impairments meet or equal the requirements of a specific Listing, the ALJ must consider the combined effect of all of them.  *See* 20 C.F.R. §§ 404.1511, 404.1520a; *Myers*, 238 F.3d at 619; *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  And, it is true that, in this instance, the ALJ did not discuss, in detail, the combined effect of Bryant's impairments each

22

time he addressed a different Listing.  However, it is clear from the record, as a whole,  that the ALJ did carefully consider the combined effect of his impairments before issuing his 10-page decision. In fact, in considering each applicable Listing, the ALJ referenced the record evidence, the expert testimony on that point, and Bryant's own testimony, if relevant to the particular regulation at issue. (Tr. at 19-20).  From those resources, he concluded that Bryant "does not have an impairment *or combination of impairments* that meets or equals in severity the requirements of any of the medical listings."  (Tr. at 21). On similar facts, the Fifth Circuit found that an ALJ did not err when he evaluated each disorder individually, without discussing the cumulative effect of the claimant's impairments each time he addressed a different disorder.  *See Owens*, 770 F.2d at 1282.  On this record, Bryant has not shown that the ALJ failed to consider the combined effect of his impairments, and the Commissioner's motion on this ground is granted.

Plaintiff also complains that the ALJ did not complete a Psychiatric Review Technique Form. (Plaintiff's Motion at 6).  This complaint is likewise without merit.  On this point, the SSA regulations are clear.  In assessing a claimant's residual functional capacity, an ALJ must evaluate four areas of mental health:   "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 404.1520a(c).  Further, following that consideration, the ALJ "must incorporate the pertinent findings and conclusions" he makes in each of these areas.  *Id.*, § 404.1520a(e)(2).  It is true that, before August 21, 2000, the regulations did require an ALJ to complete the specific form that Bryant cites, the PRTF, to address each of these areas.  *See* 65 F.R. 50746, 50775 (Aug. 21, 2000).  However, the regulations no longer require strict adherence to that format.  *See* 20 C.F.R. § 404.1520a(d).  In this instance, then, the ALJ did not err because he did not complete or include a PRTF.  It is clear that he complied with the current regulations, as he evaluated each of the areas he was required to consider before deciding

Plaintiff's claim.  (*See* Tr. at 20-26).  As the ALJ committed no error in that regard, the Commissioner's motion on that ground is granted, as well.

Finally, Plaintiff claims that the ALJ erred by his failure to conclude that his condition meets or equals the requirements of Listing 12.04.  (Plaintiff's Motion at 5).  As to that argument, SSA regulations are clear that a claimant may be said to have an impairment that is "medically equivalent" to a Listing if the available medical findings are equal in severity, and duration, to the findings that are necessary to a listed disability.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(b).  This "equivalence," however, must be based on medical evidence only, which is supported by acceptable clinical and laboratory diagnostic techniques.  *See id.*

In his appeal, Bryant contends that there is no substantial evidence to support the ALJ's finding that his depression and symptoms of psychosis do not satisfy Listing 12.04.  (Plaintiff's Motion at 5).  He argues that, in making his decision, the ALJ relied exclusively on the expert witness's testimony, and that, as a testifying witness who had never examined him, Dr. Khushalani's opinions are not entitled to such weight.  (*Id.*).  Bryant argues that, instead, the ALJ should have looked to the findings from the three examining doctors, Drs. Rustin, Nazarani, and Anderson, each of whom assigned a low GAF score, and remarked on his limited social functioning.  (*Id.* at 5-6).  Bryant contends that those findings, particularly the uniform diagnoses of psychosis, when combined with the low GAF scores, warrant the conclusion that his mental condition does, in fact, meet, or at least equal, the Listing's requirements.  (*Id.*).

As a preliminary matter, the court notes that the record contains much evidence that is at odds with the extensive impairment Bryant claims.  For instance, Bryant's own statements to his examining doctors, his applications for benefits, and his hearing testimony suggest that his activities of daily living may not be as severely restricted as alleged.  Indeed, at different times, Bryant

reported that he exercised to relieve back pain, that he groomed himself, performed limited household chores, wrote poetry, drew pictures, watched television, drove a car, used public transportation, attended aftercare meetings and medical appointments, and went to the grocery store. (Tr. at 95, 287-90, 323-24, 479).  In addition, in addressing Plaintiff's mental RFC, both Dr. Cox and Dr. Hanna found Bryant's limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation to be either "not significantly limited," or no more than "moderately limited."  (Tr. at 297-98, 349-50).  Further, even the reports from Drs. Rustin, Nazarani, and Anderson point to evidence that  Bryant's orientation, memory, concentration, abstraction, thought processes, and judgment may not be so severely impaired as to preclude any employment .  (Tr. at 217, 289-90, 324-25).  And, while those doctors each detailed "symptoms of psychosis," in their records, this may have been based entirely on Bryant's own report.  (Tr. at 216-27, 289-90, 325).

Nevertheless, each of those consultants gave Bryant GAF scores of only 40 or 50.  (Tr. at 218, 290, 326).  Scores at that level indisputably suggest serious impairment in social functioning. For instance, a person with a GAF score of 40 is considered to have "some" to  "major" impairment in "reality testing or communication," or major impairment in other areas, including work, family relations, judgment, thinking, or mood.  DSM-IV at 32.  A person with a GAF of 50 is considered to have moderate difficulty in social, occupational, or school functioning, or to have "serious symptoms," such as suicidal thoughts.  *Id.*  Clearly, such low GAF scores are inconsistent with a number of other findings in the examining doctors' reports.  (Tr. at 494-95).  Such inconsistency alone, however, is not sufficient reason to disregard the evidence of severe limitations.  This is particularly true in this instance, in which there is other evidence to support the low GAF scores. For example, Dr. Rustin concluded that Bryant's prognosis for recovery was "guarded," while Dr.

Nazarani concluded that it was "extremely guarded." (Tr. at 218, 291). Further, Bryant's neighbor, Diann Fisher, gave uncontroverted testimony that he is in need of daily assistance, and that she has observed him talking to himself, and engaging in other odd behaviors. (Tr. at 483). On this record, those inconsistencies are left unresolved. Indeed, even Dr. Khushalani lamented the "very sparse information in the medical record" regarding Bryant's mental condition. (Tr. at 489).

Here, that lack of information, whether because of Bryant's periods of incarceration, or because of his treatment at indigent centers, made the ALJ's task decidedly more complicated. The fact is, however, that he had little evidence before him beyond the consulting examiners' reports and the neighbor's testimony, from which to assess Bryant's level of impairment. And, as Dr. Khushalani emphasized in his testimony, the reports from those examining doctors are difficult to gauge for accuracy. The expert pointed out, in fact, that the consultants rendered their findings after perhaps only one examination,  with no opportunity for follow-up or any prolonged observation. This "snap shot" may not present an accurate picture, at all, of a claimant's true impairments or limitations. For that reason, the SSA regulations are clear that an ALJ has a duty to review the reports from examining consultants to determine whether the information requested from them has been supplied. 20 C.F.R. § 416.919p(a). Indeed, the ALJ must consider several factors on this point, including the following:

> (2)     Whether the report is internally consistent; Whether all the diseases, impairments and complaints described in the history are adequately assessed and reported in the clinical findings; Whether the conclusions correlate the findings from your medical history, clinical examination and laboratory tests and explain all abnormalities; [and]
>
> (3)     Whether the report is consistent with the other information available to us within the specialty of the examination requested. . . .

*Id.* Then,

> If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.

*Id.*, § 416.919p(b).  Here, Bryant's prognoses for recovery and his GAF scores were characterized by the expert witness as "inconsistent" with many of the other findings made by the same doctors in the very same reports to the requesting agency.  Moreover, those reports are undoubtedly inconsistent with the ones from two other consulting psychologists, Dr. Cox and Dr. Hanna.  Both of those examiners suggested that Bryant is no more than moderately impaired because of his mental condition.  Given the number and extent of these inconsistencies, as well as the complete absence of  any treatment  records, the ALJ should not have merely adopted  Dr. Khushalani's opinion without further inquiry.  Under the applicable regulations, he had a duty to contact the examining physicians  to clarify their findings and attempt to reconcile the inconsistencies in their reports.  *See id.*  Because he did not do so, Plaintiff's claim must be remanded for further development in adherence to that duty.

As a final matter, it should be noted that very little relevant evidence was generated before December 31, 1996, the last date on which Bryant was insured, for DIB purposes.  Absent evidence that he was disabled prior to that date, Bryant cannot proceed on his claim for an award of Disability Insurance Benefits (DIB).  *See* 42 U.S.C. § 423; *Anthony*, 954 F.2d at 295 (citing *Owens*, 770 F.2d at 1280).  However, he may still pursue a claim for Supplemental Security Income benefits (SSI), for which he has been otherwise eligible, since November 2000.  *See* 20 C.F.R. § 416.335; *Brown*, 192 F.3d at 495 n.1.   On remand then, the administrative inquiry should be limited to the SSI application only.

In sum, the ALJ did not err by failing to consider the combined effect of Bryant's impairments in determining whether his condition met or equaled the relevant Listings, or by failing to complete a PRTF.  Further, because no evidence supports a finding that he was disabled prior to the last date on which  he was insured, he is not entitled to a DIB award.  However, it is appropriate to remand Bryant's SSI claim so that the ALJ can develop the record further on the limiting effects, if any, of Plaintiff's mental impairment.  For that reason, this matter is remanded, under sentence four of 42 U.S.C. 409(g), so that the record can be developed fully, and to allow the ALJ to render a decision that is supported by substantial evidence.

**Conclusion**

Based on the foregoing, it is **ORDERED** that Plaintiff Larndell Bryant's Motion for Summary Judgment is **GRANTED, IN PART**, and that Defendant Jo Anne B. Barnhart's Motion for Summary Judgment is **GRANTED, IN PART**.  It is further **ORDERED** that Plaintiff's claim for Supplemental Security Income benefits is **REMANDED**, so that the record can be further developed on the severity of Plaintiff's mental impairment.  Additional evidence must include clarifications from the examining doctors on Bryant's actual limitations, if any, consistent with this opinion.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record

**SIGNED** at  Houston, Texas, this 20th day of September, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**

**APPENDIX A**

**12.04 Affective Disorders**: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

    1.  Depressive syndrome characterized by at least four of the following:

        a. Anhedonia or pervasive loss of interest in almost all activities; or

        b. Appetite disturbance with change in weight; or

        c. Sleep disturbance; or

        d. Psychomotor agitation or retardation; or

        e. Decreased energy; or

        f. Feelings of guilt or worthlessness; or

        g. Difficulty concentrating or thinking; or

        h. Thoughts of suicide; or

        i. Hallucinations, delusions or paranoid thinking; or

    2. Manic syndrome characterized by at least three of the following:

        a. Hyperactivity; or

        b. Pressure of speech; or

        c. Flight of ideas; or

        d. Inflated self-esteem; or

        e. Decreased need for sleep; or

        f. Easy distractability; or

        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

        h. Hallucinations, delusions or paranoid thinking;

or

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or
2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.